**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TYLER CAMERON GUTTERMAN, | ) | |
| DALE NELSON, HUNTER JOHNSON, | ) | |
| and BRIAN HILTUNEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-02801-JMS-MJD |
| | ) | |
| INDIANA UNIVERSITY, BLOOMINGTON, | ) | |
| and MICHAEL MCROBBIE, in his official | ) | |
| capacity as President of Indiana University, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendants Indiana University, Bloomington ("IU" or "the University")[1] and Michael

McRobbie, in his official capacity as President of Indiana University ("President McRobbie")

(collectively, "Defendants"), value the privacy interests of their students and protect those

interests, as well as student records, in accordance with University policy and the law. IU has over

40,000 students on its Bloomington campus, and the health, safety, and education of its students

are of paramount importance to the University. Accordingly, Defendants take very seriously

reports of hazing and will take action to help protect their students from such behavior, which

violates both Indiana law and University policy.

Plaintiffs' Complaint (Dkt. 1) stems from Defendants' alleged verification of data from

Plaintiffs' CrimsonCards—i.e., their Student ID cards—during the course of a hazing investigation

involving Plaintiffs' fraternity. Plaintiffs' data was accessed to confirm they had not been victims

---

[1] Plaintiffs incorrectly name "Indiana University, Bloomington" as a defendant in this case. The Trustees of Indiana University is the proper name of that defendant. *See* Ind. Code § 21-27-4-2.

of hazing by the fraternity, and although the fraternity was ultimately sanctioned, no adverse action was taken against Plaintiffs, who remain students at IU. Despite this fact, Plaintiffs bring 42 U.S.C. § 1983 claims against Defendants, alleging violations of the Fourth Amendment's prohibition against unreasonable searches, as well as a claim for breach of contract.

Plaintiffs' Complaint must be dismissed in its entirety. Defendants are entitled to sovereign immunity protection pursuant to the Eleventh Amendment for all of Plaintiffs' claims, with the exception of Plaintiffs' claims for prospective injunctive relief against President McRobbie. Sovereign immunity aside, Plaintiffs' Fourth Amendment claims (Counts I and II) must fail, as there was no "search" which violated their Fourth Amendment privacy interests, making dismissal proper pursuant to Fed. R. Civ. P. 12(b)(6). The breach of contract claim (Count III) must meet the same fate. Not only do Plaintiffs lack Article III standing to bring their breach of contract claim, making dismissal proper under Fed. R. Civ. P. 12(b)(1), but Plaintiffs fail to allege the requisite elements of a breach of contract action—specifically, breach and damages—making dismissal proper under Rule 12(b)(6) as well.

Defendants acted within their authority to respond to allegations of hazing and to help protect members of their student body. In doing so, no Fourth Amendment rights were violated, and no contract breached. For any or all of the reasons set forth herein, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint (Dkt. 1) in its entirety, with prejudice.

## BACKGROUND[2]

IU is a public research university located in Bloomington, Indiana. (Dkt. 1 at 2, ¶ 7.) Michael McRobbie is IU's current president. (*Id.* at ¶ 8.) Plaintiffs are current undergraduate students at IU's Bloomington campus. (*Id.* at ¶¶ 3-6, 11.)

IU issues a "CrimsonCard Photo ID" (the "CrimsonCard") to its students and employees. (*Id.* at 3, ¶ 15; *see also* "CrimsonCard Terms and Conditions," referenced in Plaintiffs' Complaint,[3] a true and accurate copy of which is attached hereto as **Exhibit A**.) The CrimsonCard "is the property of [IU]." (*Id.* at 1.) As noted in Plaintiffs' Complaint, the "CrimsonCard is much more than a photo ID. It's a print release card, keycard to authorized university buildings, library card, and if you're enrolled in a dining services plan, it's your meal ticket." (Dkt. 1 at 4, ¶ 17) (citation and quotation omitted); *see also* Ex. A at 1: The CrimsonCard is "issued by [IU] to its students and employees … to verify their identity and manage access to University services and facilities."

When issuing a CrimsonCard, IU entered into an agreement with each CrimsonCard recipient. (*Id.*) Per that agreement, "[i]n exchange for being issued a [Crimson]Card, [recipient] agrees to abide by the *Official University Identification Card Policy* (available on the University Policies website at http://policies.iu.edu) …." (*Id.*) The "Official University Identification Card Policy," a true and accurate copy of which is attached hereto as **Exhibit B**, provides that "[i]dentification information collected for production of the [Crimson]Card may be used by the University to support the safety and security of campus resources and support the mission of the

---

[2] Defendants do not concede that the facts as alleged in Plaintiffs' Complaint are accurate, but will treat them as such (as it is required to do) for purposes of this Motion only. Defendants do not, however, accept Plaintiffs' incorrect allegations regarding unambiguous contract terms. *See, e.g., McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000).

[3] Materials referred to in a complaint may be considered on a motion to dismiss. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

University. Release of this information is governed by Management of Institutional Data Policy (DM-01) … and may require approval by the appropriate data steward or data manager." (Ex. B at 4.) According to Management of Institutional Data Policy (DM-01), referenced in Plaintiffs' Complaint, a true and accurate copy of which is attached hereto as **Exhibit C**, permission to access CrimsonCard data is only granted to eligible employees and designated appointees of the University for legitimate University purposes.

In fall 2018, Plaintiffs were completing their first semester of study at IU. (Dkt. 1 at 3, ¶ 12.) All four of them chose to pledge the same Greek fraternity, Beta Theta Pi. (*Id.* at ¶ 13.) That semester, IU began investigating allegations that Beta Theta Pi was hazing its pledges.[4] (*Id.* at 3-4, ¶¶ 14, 19.) As part of its hazing investigation, IU accessed only limited data from Plaintiffs' CrimsonCards to "compar[e] their 'swipe' data to their testimony as to their whereabouts at the time of the incident." (*Id.* at 4, ¶ 18.) Plaintiffs had informed IU they were in their dorm rooms at the time in question. (*Id.*) Although Beta Theta Pi was ultimately sanctioned, Plaintiffs were not penalized or otherwise found guilty of any wrongdoing. (*Id.* at ¶ 19.)

## LEGAL STANDARD

A motion to dismiss tests the sufficiency of the complaint. *Estate of Gee v. Bloomington Hosp. and Health Care Sys.*, 2009 WL 3188300, at *1 (S.D. Ind. Sept. 29, 2009). A party may

---

[4] Examples of hazing, and the University's investigation of same, are detailed at HAZING TERMS & EXAMPLES, DIV. OF STUDENT AFFAIRS, INDIANA UNIVERSITY, available at: http://studentaffairs.indiana.edu/get-involved/student-organizations/manage-organization/policies/hazing-definitions.html. (last visited Feb. 8, 2021). For purposes of this Motion, the Court may take judicial notice of matters of public record, including government websites. *See, e.g., Prime Healthcare Servs.-Monroe, LLC v. Ind. Univ. Health Bloomington, Inc.*, 2016 WL 6818956, at *2 (S.D. Ind. Sept. 30, 2016). As set forth in Section I, *infra*, IU is an instrumentality of the State of Indiana. *See also, e.g., Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1184-85 & 1186 n.6 (N.D. Cal. 2009) (taking judicial notice of various documents which were publicly available on the University of California's website).

seek to dismiss a claim for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The burden is on the Plaintiffs to prove, by a preponderance of the evidence, that subject matter jurisdiction exists for their claims. *See Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003). "[W]hen evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly-Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). Thus, to survive a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

I.   **With the exception of Plaintiffs' claims for prospective injunctive relief against President McRobbie, Plaintiffs' Complaint is barred by the Eleventh Amendment.**

The Eleventh Amendment grants States sovereign immunity, meaning "States may not be sued unless they have waived the immunity or Congress has expressly abrogated the immunity." *Bissessur v. Ind. Univ. Bd. of Trs.*, 2008 WL 4274451, at *2 (S.D. Ind. Sept. 10, 2008) (citing *Alden v. Maine*, 527 U.S. 706, 709 (1999)). It is well-established that IU is an instrumentality of the State for the purposes of the Eleventh Amendment, and that as an instrumentality of the State, IU "enjoys the same Eleventh Amendment immunity as the State of Indiana itself." *Woods v. Ind. Univ. Purdue Univ. at Indpls.*, 996 F.2d 880, 883 (7th Cir. 1993); *see also Doe v. Ind. Univ. – Bloomington*, 2019 WL 341760, at *7 (S.D. Ind. Jan. 28, 2019); *Feresu v. Ind. Univ. Bloomington*, 2015 WL 5177740, at *3 (S.D. Ind. Sept. 3, 2015); *Shannon v. Bepko*, 684 F. Supp. 1465, 1740-

- 5 -

73 (S.D. Ind. 1988). The same is true for state officials—such as President McRobbie—sued in their official capacities. *Joseph v. Bd. of Regents of Univ. of Wis. Sys.,* 432 F.3d 746, 748 (7th Cir. 2005) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70-71 (1989)).

### A.      Plaintiffs' constitutional claims (Counts I and II)

Plaintiffs premise jurisdiction of their constitutional claims, which seek declaratory and injunctive relief for alleged Fourth Amendment violations, on 42 U.S.C. § 1983. (Dkt. 1 at 3, ¶ 2; at 11, ¶ 48; and at 12, ¶ 55). However, as an entity of the State of Indiana, IU "is not a person within the meaning of § 1983." *Martin v. Ind. State Police,* 537 F. Supp. 2d 974, 980 (S.D. Ind. 2008) (quoting *Will,* 491 U.S. at 64); *Joseph,* 432 F.3d at 748; *see also Barnes v. Bd. of Trs. of Univ. of Ill.,* 946 F.3d 384, 391 (7th Cir. 2020) ("The Board of Trustees, as part of the State, is not a 'person' capable of being sued for damages under § 1983"); *Williamson v. Ind. Univ.,* 345 F.3d 459, 464 (7th Cir. 2003) ("[S]tate universities are entities that are considered part of the state for § 1983 analysis"). This stems from the Eleventh Amendment's sovereign immunity protection, which bars claims against IU in federal court unless IU waives the immunity or Congress expressly abrogates it. *Bissessur,* 2008 WL 4274451, at *3. Here, IU has not waived immunity or otherwise unequivocally consented to this lawsuit. And it is well-settled that Section 1983's enactment did not abrogate the States' Eleventh Amendment immunity. *Kroll v. Bd. of Trs. of Univ. of Ill.,* 934 F.2d 904, 909 (7th Cir. 1991) (citing *Quern v. Jordan,* 440 U.S. 332, 341 (1979)).

Accordingly, because IU is indisputably not a "person" capable of being sued under Section 1983, and because IU has not waived its immunity or unequivocally consented to this lawsuit, Plaintiffs' Fourth Amendment claims against IU (Counts I and II) are barred and must be

- 6 -

I\15779374.9

dismissed. *See Grant v. Trs. of Ind. Univ.,* 2015 WL 4077255, at *3 (S.D. Ind. July 6, 2015); *Bissessur,* 2008 WL 4274451, at *2-3.

President McRobbie, as a state official acting in his official capacity as President of the University, also does not qualify as a "person" under 42 U.S.C. § 1983. *Rangel v. Reynolds,* 607 F. Supp. 2d 911, 921 (N.D. Ind. 2009); *Parsons v. Bourff,* 739 F. Supp. 1266 (S.D. Ind. 1989). Unlike claims against IU, however, this bar only prohibits "action[s] for damages against [President McRobbie] in [his] official capacity." *Parsons,* 739 F. Supp. at 1267; *Kashani v. Purdue Univ.,* 813 F.2d 843, 848 (7th Cir. 1987) ("Although the Eleventh Amendment bars all claims against [IU] and the damages claims against its officials in their official capacities, it does not thwart the claims against the officials in their official capacities for [] injunctive relief …"). That's because "official-capacity actions for *prospective* relief are not treated as actions against the State," avoiding an Eleventh Amendment issue. *Grant,* 2015 WL 4077255, at *3 (quoting *Will*, 491 U.S. at 71 n.10) (emphasis added).[5] For these reasons, Plaintiffs' Fourth Amendment claims (Counts I and II) against President McRobbie, acting in his official capacity, are not permitted under 42 U.S.C. § 1983 to the extent they seek damages or retrospective relief. *Bull v. Bd. of Trs. of Ball State Univ.*, 2012 WL 13028935, at *3 (S.D. Ind. Jan. 5, 2012); *see also Bissessur,* 2008 WL 4274451, at *2-3. Thus, the Court should dismiss those claims against President McRobbie.

While Plaintiffs are limited to their claims to *prospective* relief against President McRobbie acting in his official capacity, as discussed in Section II below, those claims also fail.

---

[5] Specifically, the Supreme Court has explained that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10 (internal quotations omitted).

- 7 -

### B.      Plaintiffs' state law breach of contract claim (Count III)

Similarly, Plaintiffs' state law breach of contract claim (Count III) is prohibited by the Eleventh Amendment. Here, Plaintiffs invoke the Court's supplemental jurisdiction granted pursuant to 28 U.S.C. § 1367 with respect to their state-law breach of contract claim against Defendants. (Dkt. 1 at 1, ¶ 2.) The Supreme Court, however, has held that "[Section] 1367(a)'s grant of jurisdiction does not extend to claims against non-consenting state defendants," like IU or President McRobbie. *Raygor v. Regents of Univ. of Minn.,* 534 U.S. 533, 542 (2002). Because "[t]he Eleventh Amendment prohibits the Court from adjudicating state-law claims," Plaintiffs' breach of contract claim against Defendants must be dismissed pursuant to Rule 12(b)(6). *See, e.g., Bull,* 2012 WL 13028935, at *4 (dismissing breach of contract claims against Board of Trustees and Ball State's President, among others); *Doe*, 2019 WL 341760, at *7-8 (finding breach of contract action barred by sovereign immunity).

## II.     Counts I and II of Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(6), as Defendants' review of their CrimsonCard data did not constitute a "search" for purposes of the Fourth Amendment.

Because Defendants have not waived their sovereign immunity, Plaintiffs' Fourth Amendment claims are limited to their claims to *prospective* relief against President McRobbie acting in his official capacity. (*See* Section I(A), *supra.*) But those claims must fail as well. The Fourth Amendment to the United States Constitution guarantees that people have a right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause …." U.S. Const., Amend. IV. It is enforceable to the states through the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The "Fourth Amendment protects

people, not places. What a person knowingly exposes to the public … is not a subject of Fourth Amendment protection." *Katz v. U.S.*, 389 U.S. 347, 351 (1967) (citation omitted).

A "search" occurs under the Fourth Amendment "when an expectation of privacy that society is prepared to consider reasonable is infringed." *U.S. v. Karo*, 468 U.S. 705, 712 (1984) (internal quotation omitted). An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *see also Katz*, 389 U.S. at 351-52. There is both a subjective and objective component to this determination: "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Carter*, 525 U.S. at 88. While the subjective prong is a factual inquiry, the objective prong is a question of law. *U.S. v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987) (citing cases).

A.    **Defendants did not perform a Fourth Amendment "search" of Plaintiffs' information.**

In Count I, Plaintiffs claim Defendants "deprived [them] of their Fourth Amendment right against unreasonable searches by tracking their movements into and out of their homes using swipe data." (Dkt. 1 at 10, ¶ 42.) Count II, in turn, claims that Defendants "deprived Plaintiffs of their Fourth Amendment right against unreasonable searches by retaining student ID card swipe data and continuing to access it without providing the subject of the search an opportunity to obtain precompliance review before a neutral decisionmaker." (*Id.* at 11, ¶ 50.) Because these allegations do not amount to a "search," for purposes of the Fourth Amendment, Counts I and II must be dismissed pursuant to Rule 12(b)(6).

**1.    Defendants did not infringe upon Plaintiffs' privacy.**

According to Plaintiffs, "IU officials accessed the historical records of Plaintiffs' [CrimsonCards] to track Plaintiffs' movements." (*Id.* at 3, ¶ 15). Plaintiffs claim IU "used [the data] to check the alibis of several students—including Plaintiffs—after an alleged off-campus hazing incident by comparing their 'swipe' data to their testimony as to their whereabouts at the time of the incident." (*Id.* at 4, ¶ 18.) Plaintiffs informed IU they were in their dorm rooms at the time of the hazing incident in question. (*Id.*)

Simply stated, Plaintiffs' Fourth Amendment rights were not violated by Defendants' use of their CrimsonCard data. IU owns all CrimsonCards, and as such, the data contained on those CrimsonCards (or generated by them) constitutes "institutional data" under IU's DM-01 policy. *See* Ex. A (CrimsonCard Terms and Conditions): "Cardholder understands and agrees that the Card *is the property of the University*." (emphasis added); *see also* Ex. B at 3: "The [Crimson]Card is the property of the University and will be deactivated and/or invalidated by the University upon expiration of its intended use." IU's DM-01 policy prescribes when the University or its employees may access institutional data and the appropriate uses of institutional data. Specifically, DM-01 provides that "permission to access institutional data should be granted to all eligible employees and designated appointees of the university for all legitimate university purposes." (*See* Ex. C at 3.) In this case, IU accessed the limited CrimsonCard data to protect the safety and well-being of its students, which is a legitimate university purpose under IU's DM-01 policy.

- 10 -

I\15779374.9

Similarly, the reverse side of the CrimsonCard itself also states: "Use of this card constitutes acceptance of the CrimsonCard terms and conditions. This card is the property of Indiana University …." *See* Exemplar CrimsonCard[6]:



Thus, Defendants did not violate Plaintiffs' Fourth Amendment rights by accessing institutional data in accordance with IU policy. Even if Plaintiffs could successfully argue that they have a privacy interest in University-owned data, that privacy interest is not one that society would recognize as reasonable, for the reasons discussed below.

       **2.**     **Plaintiffs' alleged privacy interest in their CrimsonCard data is not one that society recognizes as reasonable.**

Plaintiffs' claims of a reasonable expectation of privacy in their CrimsonCard data is belied by the CrimsonCard itself. As Plaintiffs' Complaint acknowledges, the "CrimsonCard is much

---

[6] This image is a true and accurate copy of the reverse-side of IU's CrimsonCard. The information redacted from the lower right-hand corner is the unique ID number associated with each CrimsonCard's user. Generally, materials referred to in a complaint may be considered on a motion to dismiss, *see Rosenblum,* 299 F.3d at 661, and with respect to images of documents, courts have considered the nature of the claims and the necessity of the document in determining whether judicial notice of such images is appropriate. In product-labeling claims, courts have routinely taken judicial notices of images of product packaging at the motion to dismiss stage. *See, e.g., Hadley v. Kellogg Sales Company,* 243 F. Supp. 2d 1074, 1087 (N.D. Cal. 2017) (taking judicial notice of Raisin Bran nutrition labeling located on the side of the cereal box). Similarly, here, each of Plaintiffs' claims relate to the CrimsonCard, its operation, its Terms & Conditions, and IU's ownership of same. For these reasons, the Court should take judicial notice of the reverse side of the Exemplar CrimsonCard, pursuant to Fed. R. Evid. 201.

more than a photo ID. It's a print release card, keycard to authorized university buildings, library card, and if you're enrolled in dining services plan, it's your meal ticket." (Dkt. 1 at 4, ¶ 17) (citation and quotation omitted).[7] Plaintiffs cannot now claim to have a reasonable expectation of privacy in their use of the CrimsonCard, given that they were aware of the capabilities of the CrimsonCard, and its connection to both IU and University life, from the very beginning.[8]

Akin to the magnetic stripe data contained on credit cards, debit cards, or gift cards, which communicates limited identifying information stored on the card to allow card users to make purchases, ATM withdrawals, confirm account information at one's bank, or access flight, hotel, or car rental reservations at self-service kiosks, the CrimsonCard similarly allow students to access their meal plan, rent library books, access campus buildings, and make purchases on campus or at participating locations off campus by communicating limited data contained on the CrimsonCard's magnetic stripe to University readers or terminals to authenticate and validate access or purchases by that card user. *See* Official University Identification Card Policy, Ex. B. at 3 ("The [CrimsonCard] is intended for use as an electronic identification, validation, and authentication credential for authorized access to services and facilities.") The Fifth, Sixth, and Eighth Circuits have *all* considered and rejected the argument that a cardholder has a Fourth Amendment privacy expectation in identifying magnetic stripe data. *See U.S. v. Turner,* 839 F.3d 429, 436 (5th Cir.

---

[7] *See also* CRIMSONCARD, available at: https://crimsoncard.iu.edu ("CrimsonCard is the official photo ID card for all Indiana University campuses. It provides access to essential university services … and secure entry to campus buildings like residence halls, offices, and recreational facilities. CrimsonCard is accepted as payment on campus and at participating local retailers") (last visited Feb. 10, 2021).

[8] *See CRIMSONCARD: IU'S OFFICIAL PHOTO ID FOR STUDENTS, FACULTY, AND STAFF*, UITS AT INDIANA UNIVERSITY (VIDEO), available at: https://crimsoncard.iu (last visited Feb. 10, 2021) or via YouTube at: https://www.youtube.com/watch?v=C1b90S5YAoU&feature=emb_logo (last visited Feb. 10, 2021) (explaining CrimsonCard features and uses).

2016) (concluding that "society does not recognize as reasonable an expectation of privacy in the information encoded in a gift card's magnetic stripe"); *U.S. v. Bah,* 794 F.3d 617, 631 (6th Cir. 2015) ("A credit card's stored information … is *intended* to be read by third parties. That is the only reason for its existence"); *U.S. v. De L'Isle,* 825 F.3d 426, 432 (8th Cir. 2016) ("[T]he purpose of a credit, debit, or gift card is to enable the holder of the card to make purchases, and to accomplish this, the holder must transfer information from the card to the seller, which negates an expressed privacy interest"). This Court should reject Plaintiffs' claim to the contrary with respect to the CrimsonCard.

Indeed, in addition to the clear language of IU's Official University Card Policy, the CrimsonCard Terms and Conditions provide that the CrimsonCard is issued by IU "to its students and employees, and others associated with Indiana University, *to verify their identity and manage access to university services and facilities*." (Ex. A at 1) (emphasis added).[9] The CrimsonCard Terms and Conditions also explain that "[i]f the magnetic stripe, or any of the technology contained in or on the card, is damaged and *becomes unreadable by any [Crimson]Card reader or terminal*, Cardholder is required to obtain a replacement [CrimsonCard] …." (*Id.* at 2). Given the express purpose of the CrimsonCard—to verify the identity of IU students and employees and to ensure appropriate access to IU services and facilities—combined with the fact that an "unreadable" card must be replaced, it is readily apparent that the CrimsonCard communicates certain identifying information by the student to the University to access IU's facilities or services. *See also* USING

---

[9] *See also* CRIMSONCARD FAQS, available at https://crimsoncard.iu.edu/about/Frequently%20Asked%20Questions.html ("[Q] Does CrimsonCard assign access to buildings and restricted areas? [A] . . . A building coordinator is assigned to each building at IU and they are responsible for assigning access within their building(s). If your access is not working, contact the building coordinator *to ensure that access has been assigned to your CrimsonCard*") (emphasis added) (last visited Feb. 10, 2021).

YOUR CARD, BUILDING ACCESS, available at: https://crimsoncard.iu.edu/using/access.html ("Your CrimsonCard gives you access to assigned areas on all IU campuses …" and noting that "access resides on the CrimsonCard").

Apart from the issue of data ownership and the capabilities of the CrimsonCard itself, as well as the information communicated by the student to the University through the student's use of the CrimsonCard, "an individual has no reasonable expectation of privacy in public movements that he voluntarily conveyed to anyone who wanted to look." *Carpenter v. U.S.*, --- U.S. ----, 138 S.Ct. 2206, 2219-20 (2018) (quotation omitted). Stated differently, the Government conducts a "search" for purposes of the Fourth Amendment where it tracks movements in private locations that could not be obtained by visual observation. *See Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 526 (7th Cir. 2018) (citing *Kyllo v. U.S.*, 533 U.S. 27, 40 (2001)); *see also Karo*, 468 U.S. at 715 (Fourth Amendment search occurred where Government used device "to obtain information that it could not have obtained by observation from outside the curtilage of the house"). Whether or not Plaintiffs are in their residence halls is not a "search," for purposes of the Fourth Amendment, as anyone could have visually observed Plaintiffs enter (or exit) their residence halls. If the information learned from the "search" is something that could have been seen by neighbors, law enforcement, or others passing by, it is not a "search." *See, e.g., U.S. v. Kelly*, 385 F. Supp. 3d 721, 726-27 (E.D. Wis. 2019) (rejecting argument that surveillance cameras monitoring apartment building entrance violated defendant's Fourth Amendment rights, where cameras did not track anything that a person standing in the same place could have seen); *see also Chaney v. City of Albany,* 2019 WL 3857995, at *8-9 (N.D.N.Y. Aug. 16, 2019) (finding no Fourth Amendment violation where police reviewed logs of automatic license plate readers located at

- 14 -

fixed locations around the city, which identified dates, times, and locations when plaintiff's car was observed on public roads).

Indeed, the conduct Plaintiffs complain of—reviewing limited data from the University-owned CrimsonCard to see whether Plaintiffs "swiped" into their residence halls—is akin to the review of a telephone pen register, which does not run afoul of the Fourth Amendment. *See, e.g., Smith v. Maryland*, 442 U.S. 735 (1979). The Supreme Court has described pen registers as devices that "do not acquire the *contents* of communications," but rather "disclose only the telephone numbers that have been dialed—a means of establishing communication." *Id.* at 741 (citation omitted) (emphasis original). Similarly, here, the CrimsonCard data reveals if and when Plaintiffs "swiped" into their residence hall(s). (Dkt. 1 at 4, ¶ 17.)

While Plaintiffs will likely argue that their CrimsonCard data is similar to the GPS device installed on a car's undercarriage in *U.S. v. Jones,* 565 U.S. 400, 402-03 (2012), which established the car's location within 50 to 100 feet and relayed more than 2,000 pages of data over a 28-day period, or to the cell-site location information (CSLI) at issue in *Carpenter*, 137 S.Ct. at 2212, which catalogued Carpenter's movements and triangulated his location with almost 13,000 location points over a four-month period, that is simply not the case and any such argument is inapt. Here, the CrimsonCard data provides a *single* data point for each "swipe" or access to a student's residence hall or dorm room.[10] It does not, however, show where Plaintiffs went once

---

[10] In fact, while the "beeper" cases which pre-date *Carpenter* and *Jones* and in which the Supreme Court found no Fourth Amendment violations, are more factually analogous to these facts, given the limited location data generated, here, the CrimsonCard data provides even less location monitoring. *See U.S. v. Knotts,* 460 U.S. 276, 281-82 (1983) (finding no Fourth Amendment violation where visual surveillance from public spaces would have revealed same information to police and "the use of the beeper to signal the presence of [the] automobile to the police receiver, does not alter the situation"); *see also Jones,* 565 U.S. at 410 (citing *Karo,* 468 U.S. at 712) ("Karo accepted the container as it came to him, beeper and all, and was therefore not entitled to object to the beeper's presence, even though it was used to monitor the container's location").

- 15 -

they were inside, what they did while inside, who they invited inside, when they went to sleep, if they made telephone calls, worked on the computer, watched television, etc. Further, as the CrimsonCard is needed only to *access* a building or one's dorm room, the data would not even reveal if or when Plaintiffs left their dorm room or the residence hall(s).[11] Thus, contrary to the cell phone data at issue in *Carpenter* or the GPS data at issue in *Jones,* the limited CrimsonCard data accessed does not provide an "intimate window" into Plaintiffs' lives, detailing their "familial, political, professional, religious, and sexual associations." 138 S.Ct at 2217 (citation and quotation omitted). Nor does it allow Defendants to "explore details of [Plaintiffs' home(s)] that would previously have been unknowable without physical intrusion." *Kyllo*, 533 U.S. at 40 (warrantless thermal imaging violated Fourth Amendment); *see also Naperville*, 900 F.3d at 526 (data collected from "smart" electricity meter, "reveals when people are home, when people are away, when people sleep and eat, what types of appliances are in the home, and when those appliances are used," constitutes a Fourth Amendment "search").

Here, Plaintiffs accepted the CrimsonCard, including the encoded magnetic stripe data capability, in exchange for the privilege of attending the University and the conveniences offered by the CrimsonCard. Through this acceptance, and through their use of the CrimsonCard, Plaintiffs "are not entitled to object" (*see supra* note 11), to the University's review of the limited swipe data for the legitimate purpose of investigating a complaint of hazing (of which, as fraternity pledges, Plaintiffs would have been victims not perpetrators) (*see* Dkt. 1 at 4, ¶ 19), and working to protect the safety and well-being of its students—which is a legitimate and anticipated use of the

---

[11] For example, if the CrimsonCard data revealed a student entered his or her residence hall at 10:00 p.m. on Friday evening and, again, at 10:00 a.m. on Saturday morning, there would be no way to know from the CrimsonCard data whether the student was returning from an hour's long run, had stepped out at 9:55 a.m. to chat with a neighbor, or had spent the night elsewhere.

- 16 -

CrimsonCard's data pursuant to IU's Management of Institutional Data Policy (DM-01) in any event. *Jones,* 565 U.S. at 410 (citing *Karo,* 468 U.S. at 712); *see also U.S. v. Howard,* 426 F. Supp. 3d. 1247, 1256-57 (M.D. Ala. 2019) (finding no "search" because defendant could not claim an ownership interest in a vehicle he borrowed and GPS surveillance was limited to a short, twenty-two hour period).

Finally, as the CrimsonCard Terms and Conditions (Ex. A) make clear, the CrimsonCard is IU's property, and as such, CrimsonCard data constitutes IU's business records. And "[t]he law is clear: no person has a legitimate expectation of privacy in the business-records of an entity with whom business has been conducted and, therefore, has no interest protected by the Fourth Amendment." *U.S. v. Simmons*, 569 F. Supp. 1155, 1157 (M.D. Tenn. 1983) (listing cases). Such records include checks and deposit slips, *U.S. v. Miller,* 425 U.S. 435 (1976); loan-guarantee agreements, *U.S. v. Payner*, 447 U.S. 727 (1980), *reh'g denied*; an employee's employment records with his employer*, Donaldson v. U.S.*, 400 U.S. 517 (1971); the numbers dialed on a telephone, *Smith*, 442 U.S. at 740-41; residential utility records, *U.S. v. McIntyre*, 646 F.3d 1107, 111-12 (8th Cir. 2011) (collecting cases); and credit card records, *U.S. v. Phibbs,* 999 F.2d 1053, 1077-78 (6th Cir. 1993). As a matter of law, for purposes of the Fourth Amendment, Plaintiffs do not have a legitimate expectation of privacy in their CrimsonCard data, which remains the property and/or business records of IU. Therefore, Defendants did not violate Plaintiffs' Fourth Amendment rights by accessing limited CrimsonCard data to confirm Plaintiffs were located in their residence hall at the time of the hazing incident in question.

For any of these reasons, to the extent Counts I and II survive Defendants' sovereign immunity defense, they must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

**B.      Even if Defendants performed a "search," for purposes of the Fourth Amendment, it was reasonable.**

Because there was no "search," no warrant—or any other "precompliance review"—was required, making dismissal of Count II appropriate on this basis as well. Even if there was a "search," no Fourth Amendment violation occurred here. In *Medlock v. Trs. of Ind. Univ.*, 738 F.3d 867 (7th Cir. 2013), the Seventh Circuit found no Fourth Amendment violation where University inspectors entered a student's dorm room for purposes of a health and safety inspection. In doing so, the Court noted that

> Medlock had consented in advance, as a condition of being allowed to live in the dormitory, to have his room searched for contraband and other evidence in violation of the health and safety code. He could have lived off campus and thus have avoided being governed by the code. *He chose to trade some privacy for a dorm room.* His expulsion amounted to holding him to his contract.

*Id.* at 872 (emphasis added). Plaintiffs, too, chose to trade some privacy for living in the University's residence halls, entry to which runs through the CrimsonCard. If the physical search of a dorm room for a health and safety inspection is not a Fourth Amendment violation, Defendants' limited access of Plaintiffs' CrimsonCard data for the legitimate University purpose of investigating a hazing incident surely cannot be a violation, either.

Plaintiffs argue that Defendants were required to "obtain precompliance review before a neutral decisionmaker" prior to the access, citing the Supreme Court's decision in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015). (Dkt. 1 at 11, ¶ 50.) In *Patel*, the Court considered whether a municipal code requiring hotel operators to provide police with specified information about its guests on demand violated the Fourth Amendment. 576 U.S. at 412. Because the search served a "'special need' other than conducting criminal investigations," the Court considered whether the municipal code fell within the "administrative search" exception to the warrant requirement. *Id.* at

- 18 -

420 (citing *Camara v. Mun. Court of City and County of San Francisco*, 387 U.S. 523, 534 (1967)). Because the municipal code did not afford the hotel operators the opportunity to have a neutral decisionmaker conduct a precompliance review of the police officer's demand for information, the municipal code was facially unconstitutional. *Id.* at 421.

But *Patel* is inapplicable here. First and foremost, *Patel* held that the hotel operators, as owners of the records at issue, had a right to precompliance review. It did not hold that the hotel *guests* had a Fourth Amendment privacy interest in their registration information. *See, e.g., U.S. v. Sesay*, 937 F.3d 1146, 1152 (8th Cir. 2019) (rejecting defendant's argument that he had a legitimate expectation of privacy in the identification card information he provided when registering at a motel). Because IU is the owner of the CrimsonCard records at issue, Plaintiffs' reliance on *Patel* is misplaced.

Rather, the correct inquiry is one of "reasonableness." *See Naperville*, 900 F.3d at 528 (where searches "are not performed as part of a criminal investigation, [the Court] can turn immediately to an assessment of whether they are reasonable") (cleaned up); *Medlock*, 738 F.3d at 872 (for purposes of university housing inspections, the Fourth Amendment's warrant requirement "can be satisfied by demonstrating the reasonableness of the regulatory package …") (quoting *Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 578 (7th Cir. 1999)). The Court must "balance[e] [the] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Naperville*, 900 F.3d at 528.

Here, as set forth above, for purposes of the Fourth Amendment, Plaintiffs did not have a reasonable expectation of privacy in their CrimsonCard data at issue. Even if they did, however, such an interest would be diminished for two important reasons. First, the CrimsonCard data was

- 19 -

collected with no prosecutorial intent toward Plaintiffs. *See id.* (limiting privacy interest where data was not collected by law enforcement and there was no risk of criminal prosecution) (citing *Camara*, 387 U.S. at 531). Indeed, the data was accessed only to confirm that *Plaintiffs were not the victims of hazing*, not to impose any sort of discipline on them. And second, the data was collected without physical entry into Plaintiffs' home(s). *Id.* (citing *Camara*'s concern that physical entry posed a "serious threat to personal and family security"). This limited privacy interest pales in comparison to Defendants' interest in investigating allegations of, and working to protect its students from, hazing, which is prohibited by both IU's Code of Student Rights, Responsibilities, and Conduct[12] and by Indiana law, *see* Ind. Code § 35-42-2-2.5. Indeed, IU's investigation resulted in sanctions for Beta Theta Pi, but no adverse actions were taken against Plaintiffs. (Dkt. 1 at 4, ¶ 19.) As such, Defendants' actions in accessing limited, CrimsonCard data for the purposes of investigating a complaint of hazing and in its efforts to promote the safety of the Plaintiffs and the University community, were more than reasonable and did not require any precompliance review.

Plaintiffs' Fourth Amendment claims against Defendants are either barred by the Eleventh Amendment or fail as a matter of law. Counts I and II of Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(6).

---

[12] *See* § II.H (relating to behaviors within and outside the University community) & § II.I (relating to off-campus activities), INDIANA UNIVERSITY CODE OF STUDENT RIGHTS, RESPONSIBILITIES, & CONDUCT, available at: https://studentcode.iu.edu/responsibilities/on-campus-personal.html & https://studentcode.iu.edu/responsibilities/off-campus-personal.html (last visited Feb. 8, 2021). For purposes of this Motion, the Court may take judicial notice of these publicly available policies, which are available on IU's website. *See supra* note 4.

### III.      Count III of Plaintiffs' Complaint must be dismissed.

Count III of Plaintiffs' Complaint alleges that certain of IU's policies constitute a contract between IU and its students, and that by accessing Plaintiffs' CrimsonCard data, Defendants breached that contract. (*See* Dkt. 1 at 12, ¶¶ 57-61.) Plaintiffs' breach of contract claim, however, is barred by the Eleventh Amendment. (*See* Section I(B), *supra.*) Sovereign immunity notwithstanding, Plaintiffs do not claim to be injured and/or damaged by IU's alleged breach, nor do they allege that damages would remedy their nonexistent injury—thereby depriving them of Article III standing. Finally, even if Plaintiffs had standing to bring this claim, they have not alleged the requisite elements to maintain a breach of contract action, nor can they establish that Defendants acted "illegally, arbitrarily, capriciously, and in bad faith." (Dkt. 1 at 12, ¶ 11) (citing *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013)). For any of these reasons, Count III of Plaintiffs' Complaint should be dismissed.

#### A.      Plaintiffs lack standing to assert a breach of contract claim where the alleged breach did not result in injury.

Standing is a threshold issue because it originates from the Constitution's limitation on the federal courts' authority to resolve "cases" and "controversies." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) (citations omitted). "The plaintiff[s], as the part[ies] invoking the court's jurisdiction, must establish the elements of standing: [they] must prove that [they have] suffered a concrete and particularized injury that is both fairly traceable to the challenged conduct and likely to be redressed by a favorable judicial decision." *Id.* (citing *Spokeo, Inc. v. Robins*, --- U.S. ----, 136 S.Ct. 1540, 1547 (2016)); *see also Doe v. Pence*, 2017 WL 956365, at *2 (S.D. Ind. Mar. 13, 2017) ("The irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to

- 21 -

the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.") (cleaned up).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and "actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S.Ct. 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotations omitted). The purpose of the "imminence" requirement "is to ensure that the alleged injury is not too speculative for Article III purposes— that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis original).

"[I]f a plaintiff's standing is questioned … in a motion to dismiss under Rule 12(b)(1) … the plaintiff must supply proof, by a preponderance of the evidence or to a reasonable probability, that standing exists." *Spuhler v. State Collection Serv. Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) (citations omitted). If—as is the case here—"the parties lack a legally cognizable interest in the outcome, the claim is moot, and the court must dismiss for want of jurisdiction." *Doe*, 2017 WL 956365, at *2 (citations omitted).

Here, Plaintiffs allege that Defendants' use of their CrimsonCard data constituted a breach of their contract. (Dkt. 1 at 12, ¶ 60.) For purposes of this Motion only, Defendants accept as true that there was a contract, and that it is set forth in the CrimsonCard Terms and Conditions (Ex. A) and the incorporated University policies (Ex. B and Ex. C). However, Plaintiffs have articulated no legally cognizable injury as a result of Defendants' alleged breach. Plaintiffs do not allege they were expelled, suspended, or otherwise penalized in any way because Defendants accessed their

- 22 -

swipe data, nor do they claim to have suffered any harm whatsoever as a result. Indeed, Plaintiffs' Complaint affirmatively states the opposite. Plaintiffs' are *current* undergraduate students, and Plaintiffs acknowledge they *were not penalized or otherwise found guilty of any wrongdoing* after their data was accessed. (Dkt. 1 at 4, ¶ 19.) Thus, by Plaintiffs' own admission, they have not suffered an "injury," for purposes of standing. *See, e.g., Nettles v. Midland Funding LLC*, 983 F.3d 896, 900 (7th Cir. 2020) (plaintiff lacked standing where "complaint does not allege that the statutory violations harmed her in any way or created any appreciable risk of harm to her"); *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 334 (7th Cir. 2019) (plaintiff lacked standing where complaint failed to allege that defendant's "actions harmed or posed any real risk of harm"); *Lardas v. Grcic*, 847 F.3d 561, 566 (7th Cir. 2017) (plaintiff lacked standing where she asserted "no injury personal to her").

Nor do Plaintiffs allege that their nonexistent injury would be remedied by judicial action, which is required for Article III standing. Indeed, Plaintiffs' prayer for relief includes a number of requested declarations and injunctions, and seeks "nominal damages of $1." (Dkt. 1 at 13.) But none of the requested relief is tied to Plaintiffs' breach of contract claim, nor do Plaintiffs claim that any of the requested relief would remedy their alleged injury. For this additional reason, Plaintiffs lack standing to bring their breach of contract claim. *Contra RK Co. v. See*, 622 F.3d 846, 851 (7th Cir. 2010) ("RK easily meets these constitutional minimum requirements [for standing] because it alleges: (1) it lost its $500,000 investment (2) due to Dr. See's violations of federal and state securities laws and (3) damages would remedy the injury."). As such, Count III— if it is not dismissed on sovereign immunity grounds—must be dismissed pursuant to Rule 12(b)(1). *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) ("If the plaintiff lacks

standing, the federal court lacks subject matter jurisdiction and the suit must be dismissed under Rule 12(b)(1).").

**B.      Alternatively, the Court must dismiss Count III of Plaintiffs' Complaint pursuant to Rule 12(b)(6).**

Even if this Court were to determine that Plaintiffs have standing to bring their breach of contract claim, and it is not dismissed on sovereign immunity grounds, the Court should dismiss it for failure to state a claim. For purposes of this Motion only, Defendants do not dispute the existence of a contractual relationship with Plaintiffs; however, they *do* dispute that (a) they breached that contract, and (b) Plaintiffs were damaged as a result of that alleged breach. Because Plaintiffs cannot establish the requisite elements of their breach of contract claim, *see Auto-Owners Ins. Co. v. C & J Real Estate, Inc*., 996 N.E.2d 803, 805 (Ind. Ct. App. 2013) ("The essential elements of a breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages.") (internal citations and quotations omitted)), Count III should be dismissed pursuant to Rule 12(b)(6).

**1.      IU did not breach its contract with Plaintiffs.**

Motions to dismiss for failure to state a claim premised on Federal Rule of Civil Procedure 12(b)(6) are often granted in situations where, as here, a plaintiff's claim for breach of contract is contradicted by the unambiguous language of the contract at issue. *See, e.g.*, *Bartel v. NBC Universal, Inc.*, 543 F.3d 901 (7th Cir. 2008) (affirming 12(b)(6) dismissal of complaint based on defendant's clear compliance with the terms of the parties' contract); *McWane*, 224 F.3d at 584 (affirming lower court's dismissal of contract claim based on the unambiguous language of the contract). Moreover, although a court ordinarily must accept the allegations of the plaintiff's complaint as true for purposes of a motion to dismiss, it is not required to accept a plaintiff's

- 24 -

interpretation of contractual terms. *McWane,* 224 F.3d at 584 ("If the district court determines that the contract is unambiguous, it may determine its meaning as a matter of law. The unambiguous contract controls over contrary allegations in the plaintiff's complaint." (internal citations and quotations omitted)).

Here, as discussed in detail above, IU owns all CrimsonCards, and as such, owns the data they generate. (*See* Ex. A at 1; Ex. B at 3.) Because IU owns the CrimsonCard, Defendants cannot breach their contract with Plaintiffs by *accessing data the University already owns.*

On top of the fact that IU—and not Plaintiffs— owns the data at issue, Plaintiffs admit it is the University's policy to provide access to necessary personnel "for all legitimate university purposes." (Dkt. 1 at 6, ¶ 25) (quoting Ex. C at 3). Plaintiffs' Complaint alleges that their CrimsonCard data was accessed in connection with "an investigation by IU officials into suspected or alleged hazing incidents." (*Id.* at 3, ¶ 14.) According to Plaintiffs' Complaint, Defendants' hazing investigation resulted in sanctions against the suspect fraternity. (*Id.* at 4, ¶ 19.) Given that hazing is prohibited by IU's Student Code of Rights, Responsibilities, and Conduct[13] and by Indiana law, *see* Ind. Code § 35-42-2-2.5, Defendants' investigation of the suspected hazing, including their access to and use of Plaintiffs' CrimsonCard data, was a "legitimate university purpose[]." (Ex. C at 3.) And it undoubtedly was "used by the University to support the safety and security of campus resources and support the mission of the University." (Ex. B at 4.)

Finally, a breach of contract claim cannot survive if the contract at issue does not actually create the duty the plaintiff alleges was breached. *See Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829, 847-48 (S.D. Ind. 2005) (dismissing claim where the terms

---

[13] *See supra* note 12.

did not give rise to a "contractual duty"); *Hess v. Biomet, Inc.,* 2017 WL 661511, at *4 (N.D. Ind. Feb. 16, 2017) (where the complaint does not identify an express contractual obligation allegedly breached, it fails to state a claim for breach of contract); *United States for Use and Benefit of Sustainable Modulare Mgmt., Inc. v. Custom Mech. Sys.*, *Corp.*, 2017 WL 1807111, at *3-7 (S.D. Ind. May 5, 2017).

Quite simply, none of the University policies Plaintiffs cite create the contractual duty they claim Defendants breached. Specifically, Plaintiffs claim the UA-13 policy (Ex. B) "does not entitle the University to access, use, or release [Plaintiffs' CrimsonCard] data, and the use of [such] data to check past entries to University buildings to check the alibis of students during an investigation does not comport with the intended purpose of the card—to contemporaneously verify the identity and manage access to University services and facilities by cardholders." (Dkt. 1 at 8, ¶ 33.) But neither the UA-13 policy, nor any other policy referenced in Plaintiffs' Complaint, prohibits Defendants from doing so. (*See generally* Ex. A, Ex. B, and Ex. C.)

For a breach of contract to occur, the contract at issue must *actually prohibit* the alleged conduct. *See Perfect Flowers Inc. v. Teleflora LLC*, 2012 WL 2994636, at *3 (S. D. Ind. July 20, 2012) (dismissing breach of contract claim where no provision in the contract prohibited defendant's alleged conduct). And courts cannot infer a duty not *explicitly stated* in an unambiguous contract. *Acheron Med. Supply, LLC v. Cook Int'l*, 2017 WL 4310163, at *7 (S.D. Ind. Sept. 28, 2017) ("Indiana law very much eschews the practice of courts interfering duties that the parties have not included in their unambiguous contracts"); *DayCo Acquisition Holding, Inc. v. Wendy's Intern., Inc.*, 2008 WL 755283, at *6, *13 (S.D. Ohio Mar. 19, 2008). Because there is no University policy, term, or condition that prohibited Defendants from accessing Plaintiffs'

- 26 -

CrimsonCard data in connection with their investigation of the suspected hazing, Plaintiffs' breach of contract claim fails as a matter of law. *See Perfect Flowers,* 2012 WL 2994636, at *2-3.

For any of these reasons, Defendants did not breach their contractual agreement(s) with Plaintiffs by accessing CrimsonCard data, as alleged in the Complaint. Count III of Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(6).

### 2.   Plaintiffs did not suffer damages as a result of the alleged breach.

Separately, Plaintiffs were not and cannot plausibly plead or prove they were damaged by Defendants' purported breach of contract. "Compensable damages are an element of a breach of contract cause of action as well." *Pisciotta v. Old Nat. Bancorp.* 499 F.3d 629, 635 (7th Cir. 2007) (citing *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 894 (Ind. Ct. App. 2007)). As set forth in Section III(A) above, Plaintiffs do not allege any injury or damage as a result of the alleged breach. Indeed, they affirmatively state they suffered no adverse action as a result of Defendants' alleged accessing of CrimsonCard data. (*See* Dkt. 1 at 4, ¶ 19.) Because Plaintiffs have not alleged they incurred any damages in connection with Defendants' alleged breach, Count III must be dismissed for failure to state a claim pursuant to Rule 12(b)(6). *See, e.g., Small Business Lending, LLC v. Pack*, 2020 WL 1702230, at *7-8 (S.D. Ind. Apr. 8, 2020); *Directv, LLC v. Spina,* 2016 WL 3097212, at *5 (S.D. Ind. June 3, 2016).[14]

---

[14] In *Spina*, this Court dismissed plaintiff's complaint where plaintiff had merely alleged that it had been damaged, reasoning that a "bare-bones allegations that it 'was damaged' does not satisfy applicable pleading standards." 2016 WL 3097212, at *5. Making dismissal even more clear cut here, Plaintiffs' Complaint does not even include threadbare allegations of damage. *Id.* (citing *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404-05 (7th Cir. 2010)).

I\15779374.9

3. **Plaintiffs' breach of contract claim is governed by the written contract(s), not *Amaya*.**

Finally, Plaintiffs seemingly rely on the Indiana Court of Appeals' decision in *Amaya v. Brater*, 981 N.E.2d 125 (Ind. Ct. App. 2013), as the basis for their breach of contract claim. (*See* Dkt. 1 at 12, ¶¶ 57, 61.) But that case is inapt here, where student dismissal is not at issue and the alleged contract has been reduced to writing. In *Amaya*, a student had been dismissed from the Indiana University School of Medicine ("IUSM") for cheating. The student filed a lawsuit against IUSM, raising a number of claims, one of which was breach of contract, contending that IUSM had breached its implied contract with him in the course of its disciplinary investigation and dismissal. *Id.* at 1240-41. In considering whether the trial court had properly entered summary judgment in IUSM's favor on the breach of contract claim, the Indiana Court of Appeals noted that "Indiana courts have taken a very flexible approach" to the implied contractual relationship between student and university, and that the "sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Id.* at 1240 (citing cases).

Here, as detailed above, Plaintiffs were not subject to any discipline, let alone dismissal. (*See* Dkt. 1 at 4, ¶ 19.) Nor do Plaintiffs claim Defendants breached the "implied contract between student and university," which is what must be analyzed under the "very flexible" standard of *Amaya*. Instead, Plaintiffs' claim that Defendants breached their CrimsonCard contract with them—a contract which has been reduced to writing and has explicit terms and conditions (none of which were breached). (*See* Ex. A.) For this reason, Plaintiffs' citation to and/or reliance upon *Amaya* is misplaced.

- 28 -

Even if *Amaya* was applicable here, there are simply no facts or evidence to support Plaintiffs' claim that Defendants "acted illegally, arbitrarily, capriciously, and in bad faith," (Dkt. 1 at 9, ¶ 39; at 12, ¶ 61). Indeed, as detailed in numerous instances above, Defendants were investigating reports of a hazing incident, which later resulted in sanctions for the fraternity at issue. (*Id.* at 4, ¶¶ 18-19.) In doing so, Defendants accessed limited, specific CrimsonCard data for the time of the alleged hazing incident to determine whether Plaintiffs were the victims of hazing. (*Id.*) Certainly, Defendants' actions to investigate, respond to, and protect their students from hazing (which is against Indiana law and violates University policy) cannot reasonably be considered illegal, arbitrary, capricious, or in bad faith, particularly where IU's DM-01 provides for access to institutional data to conduct university business "in ways consistent with furthering the university's mission of education, research, and public service." (Ex. A at 3; *see also* Ex. B at 4 (allowing use by the University "to support the safety and security of campus resources and support the mission of the University"). For this separate reason, Count III of Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(6).

## CONCLUSION

IU takes the privacy rights of its students very seriously. But it must balance those interests with its commitment to the health, safety, and education of its students. The University must investigate allegations of hazing, and in doing so, determine the veracity of student statements relating to those allegations. Here, Defendants' limited use of CrimsonCard data in the course of a hazing investigation was entirely proper, and did not result in any Fourth Amendment violation of Plaintiffs' privacy, nor did it constitute a breach of any contract.

I\15779374.9

With the exception of claims for prospective injunctive relief against President McRobbie in his official capacity, all of Plaintiffs claims should be dismissed pursuant to the Eleventh Amendment's grant of sovereign immunity. The remaining claims against President McRobbie in his official capacity fail as a matter of law, as Defendants' actions did not violate Plaintiffs' Fourth and Fourteenth Amendment rights. For the reasons set forth in detail herein, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice, pursuant to either Fed. R. Civ. P. 12(b)(1) or 12(b)(6).

Respectfully submitted,

ICE MILLER LLP

/s/ Jenny R. Buchheit
Jenny R. Buchheit
Stephen E. Reynolds
Sean T. Dewey
Tiffany S. Kim
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
jenny.buchheit@icemiller.com
stephen.reynolds@icemiller.com
sean.dewey@icemiller.com
tiffany.kim@icemiller.com

*Attorneys for Defendants Indiana University, Bloomington and Michael McRobbie, in his official capacity as President of Indiana University*

- 30 -

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on February 16, 2021, a copy of the foregoing was filed electronically through the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

Anita Y. Milanovich
Milanovich Law, PLLC
100 East Broadway Street
The Berkeley Room
Butte, MT 59701
aymilanovich@milanovichlaw.com

Jeffrey M. Schwab
Daniel R Suhr
Reilly Stephens
Liberty Justice Center
190 South LaSalle Street, Suite 1500
Chicago, IL 60603
jschwab@libertyjusticecenter.org
dsuhr@libertyjusticecenter.org
rstephens@libertyjusticecenter.org

*Attorneys for Plaintiffs*

                                  /s/ Jenny R. Buchheit
                                  Jenny R. Buchheit

ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
(317) 236-2100

- 31 -

I\15779374.9