**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TYLER CAMERON GUTTERMAN, | ) | |
| DALE NELSON, HUNTER JOHNSON, | ) | |
| and BRIAN HILTUNEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-02801-JMS-MJD |
| | ) | |
| INDIANA UNIVERSITY, BLOOMINGTON, | ) | |
| and MICHAEL MCROBBIE, in his official | ) | |
| capacity as President of Indiana University, | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Plaintiffs' Opposition to Defendants' Motion to Dismiss (Dkt. 28) is chock full of "facts" which do not appear in the Complaint (Dkt. 1). While a party opposing a Rule 12(b)(6) motion has some flexibility in elaborating on factual allegations, they nonetheless must be consistent with the Complaint. *See, e.g., Alley v. Penguin Random House,* 2020 WL 6873472, at *2-3 (S.D. Ind. Nov. 23, 2020) (finding plaintiff's multiple conflicting representations reflected "claim[s] inconsistent with the pleadings"). By way of example only, in their Complaint, Plaintiffs allege that the University "retained the swipe data for several months," using it to check their whereabouts during alleged hazing violations by Beta Theta Pi, the fraternity they were pledging. (Dkt. 1 at 4, ¶ 18.) In their Opposition, however, Plaintiffs' intimate that the University retains swipe data indefinitely "without appropriate safeguards represent[ing] an *ongoing injury*." (Dkt. 28 at 21.) They also claim—for the first time—that the University's "tracking" of them was employed as part of "an official investigation into Plaintiffs' conduct (to see if [the University] could convict them of the

administrative equivalent of perjury)," and that they were "subjected to an illegal process … which is represented in their academic record." (*Id.* at 21-22.) There is no basis to these allegations, either in their Complaint or in fact. Indeed, their Complaint alleges the opposite—that Plaintiffs were neither the target of the University's hazing investigation nor the recipient of any disciplinary action. (Dkt. 1 at 3-4, ¶¶ 13-14, 18-19.) It is undisputed that Plaintiffs were not the subject of any disciplinary investigation or action by the University.

Confronted with the reality that they themselves have not suffered any actionable harm, Plaintiffs have pivoted in their Opposition, now seemingly attempting to vindicate the sanctions imposed against their fraternity, who is not a party to this case. (*See* Dkt. 28 at 22 ("while Plaintiffs were not personally expelled or suspended, the fraternity, which they are still members of, *was* subject to sanction) (emphasis original); *see also id.* at 10 ("while Plaintiffs were found innocent[1] of any wrongdoing, sanctions were handed out to Beta—under different facts could have been even more significant.").) But Plaintiffs cannot substitute an alleged injury to their fraternity for their alleged damages in this case—especially where Beta Theta Pi is not a party to this action.[2]

As set forth here and in Defendants' Memorandum (Dkt. 20), Plaintiffs' Complaint must be dismissed in its entirety. Defendants are entitled to sovereign immunity protection pursuant to the Eleventh Amendment for all of Plaintiffs' claims, with the exception of Plaintiffs' claims for

---

[1] Plaintiffs have taken liberties by claiming they were "found innocent" or "vindicated." (*See* Dkt. 28 at 21.) Given Plaintiffs' allegations that they were freshmen pledges, they were "more likely to be the victims of any hazing activity." (Dkt. 1 at 4, ¶ 19.) Because the University's investigation focused on the *fraternity's* actions, rather than Plaintiffs', it is inaccurate to say that there was any "finding" attributable to them. In short, Plaintiffs cannot be "innocent," "guilty," or "vindicated" when they were never investigated or disciplined in the first place.

[2] Plaintiffs' reliance on *Doe v. Baum,* 903 F.3d 575 (6th Cir. 2018), is likewise flawed. (*See* Dkt. 28 at 10.) Not only did *Baum* involve an investigation into Title IX sexual misconduct (for which some courts have found that universities should offer heightened due process protections, and for which the Seventh Circuit has so far declined to address), but it was in the context of an *individual* conduct proceeding. Further, that *Baum* required the university to afford a student accused of sexual misconduct certain due process protections, including an opportunity for cross-examination at a hearing, is of no moment here. No conduct charges were ever brought against Plaintiffs, and nothing suggests the fraternity wasn't afforded due process in connection with its disciplinary sanctions.

prospective injunctive relief against President McRobbie. And sovereign immunity notwithstanding, Defendants acted within their authority to respond to allegations of hazing and to help protect members of their student body. In doing so, no Fourth Amendment rights were violated, and no contract was breached. Plaintiffs are bound by their Complaint, and their attempt to embellish the narrative with inconsistent facts and far-fetched theories must be rejected. For these reasons, Plaintiffs' Complaint (Dkt. 1) should be dismissed in its entirety.

I.      **Plaintiffs' Eleventh Amendment analysis is incorrect because, unlike in the cases they cite, Plaintiffs have not asserted any individual capacity claims.**

Plaintiffs do not dispute that IU is an instrumentality of the State for the purposes of the Eleventh Amendment, and that as an instrumentality of the State, IU "enjoys the same Eleventh Amendment immunity as the State of Indiana itself." *Woods v. Ind. Univ. Purdue Univ. at Indpls.,* 996 F.2d 880, 883 (7th Cir. 1993). Nor do they argue that President McRobbie, as a state official sued in his official capacity, is not entitled to Eleventh Amendment protection. *See, e.g., Joseph v. Bd. of Regents of Univ. of Wis. Sys.,* 432 F.3d 746, 748 (7th Cir. 2005) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70-71 (1989)). Rather, they claim an exception applies. (*See* Dkt. 28 at 4-5.) Plaintiffs are wrong.

A.      **Plaintiffs' constitutional claims (Counts I and II)**

In support of their argument, Plaintiffs rely on *Medlock v. Trs. of Ind. Univ.,* 738 F.3d 867, 871 (7th Cir. 2013). Specifically, they postulate that because University *employees* are subject to Section 1983 suits for violations of constitutional rights, then by extension, there is no basis to dismiss their Complaint against the University and President McRobbie on sovereign immunity grounds. But that's not the law. It is well-established that Section 1983's enactment did not abrogate the States' Eleventh Amendment immunity. *Kroll v. Bd. of Trs. of Univ. of Ill.,* 934 F.2d

904, 909 (7th Cir. 1991) (citing *Quern v. Jordan*, 440 U.S. 332, 341 (1979)). And because Plaintiffs' argument is essentially an attempt at backdoor abrogation, it must be rejected.

*Medlock* is also procedurally distinguishable. In *Medlock*, the complaint included claims against the University,[3] official-capacity claims against the dean of students and the University's provost, and individual-capacity claims against two student inspectors and a police officer. *Id.* at 870. In contrast, here, Plaintiffs have brought claims against the University and official-capacity claims against President McRobbie only. Therefore, Plaintiffs' reliance on the *Medlock* court's reasoning that "the student inspectors and university police are university employees and therefore state actors" for purposes of Section 1983, *id.* at 871, is misplaced. As Plaintiffs have not brought any individual-capacity claims, their argument against Eleventh Amendment protection fails.

Because the Eleventh Amendment applies, and Defendants have not waived its protection or consented to being sued in federal court, Plaintiffs' Fourth Amendment claims against IU (Counts I and II) are barred and must be dismissed. *See Grant v. Trs. of Ind. Univ.,* 2015 WL 4077255, at *3 (S.D. Ind. July 6, 2015); *Bissessur v. Ind. Univ. Bd. of Trs.,* 2008 WL 4274451, at *2-3 (S.D. Ind. Sept. 10, 2008). Likewise, Plaintiffs' Fourth Amendment claims (Counts I and II) against President McRobbie, acting in his official capacity, are not permitted under 42 U.S.C. § 1983 to the extent they seek damages or retrospective relief. *Bull v. Bd. of Trs. of Ball State Univ.*, 2012 WL 13028935, at *3 (S.D. Ind. Jan. 5, 2012); *see also Bissessur,* 2008 WL 4274451, at *2-3. Thus, the Court should dismiss those claims against President McRobbie.

For purposes of the Eleventh Amendment analysis, the only portions of Counts I and II that can survive are claims for *prospective* injunctive relief against President McRobbie acting in his

---

[3] As explained in Defendants' Opening Memorandum, the Trustees of Indiana University is the proper name of Defendant Indiana University, Bloomington. (Dkt. 20 at 1 n.1.)

official capacity. And though they may survive for purposes of the Eleventh Amendment analysis, as discussed below, they nonetheless fail for failure to state a claim.

### B.    Plaintiffs' state law breach of contract claim (Count III)

In passing, Plaintiffs claim that sovereign immunity "[does not] prevent this court from redressing Plaintiffs' breach-of-contract claim." (Dkt. 28 at 5.) The cases they cite, however, are unhelpful. For example, Plaintiffs claim that "in [*Bissessur*] this Court went on to address the state-law breach-of-contract claim after resolving other claims on immunity grounds." (*Id.* at 5-6.) Again, this argument misses the mark.[4] *Bissessur* dealt with official-capacity and individual-capacity claims. The mere fact that the court later addressed the merits of the contract claim does not stand for the proposition that state-law claims always survive the Eleventh Amendment. (They do not.) Indeed, the court explained that the *Ex Parte Young* doctrine only "permits the doctrine of sovereign immunity to be skirted when a state officer is named as the defendant [in his official capacity], rather than the state itself, and the Complaint is based on a claim that the officer is engaged in ongoing violations of *federal law*." *Id.* at *2 (emphasis added). It simply has no applicability to state law claims. *See Phi Kappa Tau Chapter House Ass'n of Miami Univ. v. Miami Univ.*, 2013 WL 427416, at *5 (S.D. Ohio Feb. 4, 2013) ("As to Plaintiffs' proposed state law claims, the Eleventh Amendment would bar all official-capacity claims against university official regardless of the relief sought.") (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89

---

[4] Plaintiffs' other citations are unhelpful. *Turner v. Vincennes Univ.,* 2019 WL 8266775 (S.D. Ind. March 29, 2019), was not even a Section 1983 action—it involved underlying alleged civil rights violations under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213. Similarly, *Tyler v. Trs. of Purdue Univ.,* 834 F. Supp. 2d 830 (N.D. Ind. 2011), involved underlying Title VII and Equal Pay Act sex discrimination claims and an Age Discrimination in Employment Act (ADEA) claim—not a Section 1983 claim. Most importantly, Purdue did not seek Eleventh Amendment protection from the state-law claim. (*See generally* Purdue's Mem. in Support of Motion for Summary Judgment, 2010 WL 11628596.) For these reasons, application of *Turner* and *Tyler* here is dubious and inapt. Lastly, *Lassiter v. Ala. A & M Univ.,* 3 F.3d 1482, 1485 (11th Cir. 1993), is distinguishable. That opinion was also vacated. *See* 19 F.3d 1370 (11th Cir. 1994) ("IT IS ORDERED that the above cause shall be reheard by this court en banc. The previous panel's opinion is hereby VACATED"). And the portion of *Lassiter* quoted by Plaintiffs does not appear in the *en banc* decision. *Compare* Dkt. 28 at 5 *with Lassiter,* 28 F.3d 1146 (11th Cir. 1994) (en banc).

(1984)). Therefore, because "[t]he Eleventh Amendment prohibits the Court from adjudicating state-law claims," Plaintiffs' breach of contract claim against Defendants must be dismissed pursuant to Rule 12(b)(6). *See, e.g., Bull,* 2012 WL 13028935, at *4; *Doe v. Ind. Univ. – Bloomington,* 2019 WL 341760, at *7-8 (S.D. Ind. Jan. 28, 2019) (finding breach of contract action barred by sovereign immunity).[5]

## II.   Plaintiffs' Fourth Amendment claims fail.

### A.   Plaintiffs' overbroad reading of *Carpenter* is misplaced.

Plaintiffs continue to incorrectly frame their Fourth Amendment analysis around the *interior* of Plaintiffs' dorm room. (*See* Dkt. 28 at 6-7.) There are simply no allegations that support any inference that the University searched or entered Plaintiffs' dorm rooms or otherwise "invade[d] students' privacy in the most intimate of spaces, their home, [using] modern technology …" (*Id.* at 20.) Rather, Defendants accessed limited, specific CrimsonCard data, relating only to the time of the alleged hazing incident, to determine when Plaintiffs accessed their residence halls as part of Defendants' investigation into whether members of Plaintiffs' pledge class were the victims of hazing by their fraternity.

Predictably, Plaintiffs hang their hat on *Carpenter v. U.S.,* --- U.S. ----, 138 S.Ct. 2206 (2018), and *United States v. Jones*, 565 U.S. 400 (2012). (Dkt. 28 at 15-19.) But as previously explained, those cases aren't applicable here. (*See* Dkt. 20 at 15-17.) In an attempt to shoehorn their argument into a *Carpenter*-style analysis, Plaintiffs claim that the University uses swipe data to "track[] Plaintiffs all around campus: where and when they eat, sleep, do laundry, study, shop, and even go to the bathroom[6] … add[ing] up to a comprehensive portrait of their movements."

---

[5] If the Court were to arrive at a different conclusion, Plaintiffs conceded that their contract claim against President McRobbie would necessarily be limited to *prospective* injunctive relief. (*See* Dkt. 28 at 5.)

[6] The Complaint makes no allegation regarding collection of data regarding bathroom use. (*See* Dkt. 1 at 4, ¶ 17.)

(Dkt. 28 at 19.) Not only is this characterization vastly different from the allegations in their Complaint that the University retained only a few months of data and used it for the limited purpose of checking their whereabouts "at the time of the [hazing] incident," (Dkt. 1 at 4, ¶ 18), which allegations must govern the Court's consideration of this Rule 12 motion, *see Peterson v. Wexford Health Sources, Inc.,* 986 F.3d 746, 752 n.2 (7th Cir. 2021) (recognizing consideration of 12(b)(6) confined to well-pleaded facts in plaintiff's complaint and any elaborations made in opposing dismissal must be "consistent with the pleadings"); *Alley,* 2020 WL 6873472, at *1 (same), but the data generated by the CrimsonCard is distinguishable from Cell Site Location Information (CSLI) in several important ways.

First, data stored on or generated by CrimsonCards is "institutional data" under IU's DM-01 policy. *See* Dkt. 20-1 (CrimsonCard Terms and Conditions): "Cardholder understands and agrees that the Card *is the property of the University*." (emphasis added); *see also* Dkt. 20-2 at 3: "The [Crimson]Card is the property of the University and will be deactivated and/or invalidated by the University upon expiration of its intended use." IU's DM-01 policy prescribes when the University or its employees may access institutional data and the appropriate uses of that data. Specifically, DM-01 provides that "permission to access institutional data should be granted to all eligible employees and designated appointees of the university for all legitimate university purposes." (*See* Dkt. 20-3 at 3.) In this case, only a few IU employees accessed the limited CrimsonCard data to investigate claims of hazing, which violate both University policy and Indiana law, and to protect the safety and well-being of its students, both of which are undoubtedly legitimate university purposes under IU's DM-01 policy.

In *Heeger v. Facebook, Inc.,* --- F. Supp. 3d ----, 2020 WL 7664459, at *4-5 (N.D. Cal. Dec. 24, 2020), the court considered whether Facebook's *collection, storage and use* of plaintiffs'

IP address information ran afoul of *Carpenter*. The *Heeger* court answered that question with an emphatic 'no'. *Id.* at *4. As it explained, "[t]he collection of IP addresses is a country mile from the CSLI collected in *Carpenter*." *Id.* That's because "there is no legally protected privacy interest in IP addresses." *Id.* Further distinguishing *Carpenter*, the court reasoned that *Carpenter* was limited to the unique context of CSLI, noting that "cell-site location information data and IP addresses are apples and oranges for privacy purposes." *Id.* CSLI is "generated several times a minute whenever a cell phone's signal is on, even if the owner is not using one of the phone's features." *Id.* (cleaned up). IP addresses, in contrast to CSLI, while they can show location data, were "akin to a pen register[7] recording the outgoing phone numbers dialed on a landline telephone," which "will not do for a privacy injury." *Id.* Despite Plaintiffs' attempts to liken this case to the CSLI addressed in *Carpenter,* the *Heeger* court's analysis of the collection, storage, and use of IP addresses is a much more apt comparison to the CrimsonCard data at issue here. (*See* Dkt. 20 at 16-17.)

Plaintiffs' Opposition seemingly suggests that the University actively tracks *every* student as if the CrimsonCard is a GPS tracking device or pings to cell towers. Though the smartphones Plaintiffs likely carry with them every day do just that, the CrimsonCard does not. Indeed, the CrimsonCard is needed only to *access* a building or one's dorm room—it does not show where someone goes after swiping into a building, nor does it reveal if or when (or with whom) they leave. (*See* Dkt. 20 at 16.) Similarly, swipe card data does not show or reasonably demonstrate the

---

[7] Defendants explained why CrimsonCard data is more similar to the information generated by a pen register in their Memorandum. (*See* Dkt. 20 at 15.)

purpose or intent of someone's access, which Plaintiffs seem to suggest in their misguided attempt to argue that the capabilities of the CrimsonCard could be used for nefarious purposes.[8]

As *Carpenter* explained, CSLI is unique because it can used to "track" multiple persons at very frequent intervals (perhaps revealing phone users frequently in close proximity to one another, where they go, and how long they stay), regardless of whether one is actively using their smartphone. CSLI is "generated several times a minute," even when "the owner is not using one of the phone's features," which limits one's ability to opt out. *Heeger,* 2020 WL 7664459, at *4. To this end, *Carpenter* involved the unwitting and systematic collection of more than 13,000 data points over a four-month period. *See* 137 S.Ct. at 2212.

In sharp contrast, here, CrimsonCard data is *not* continuously or involuntarily generated. Instead, Plaintiffs generate CrimsonCard data only when they voluntarily and *physically use* their CrimsonCard at a reader or terminal to authenticate access to the building or room. (*See* Dkt. 20 at 12-13) (explaining the purpose of the CrimsonCard and the reading of the magnetic stripe data at readers or terminals on campus). Thus, unlike CSLI, CrimsonCard swipe card data cannot identify when two or more people enter a building simultaneously (i.e., holding the door for a friend), or where access is made due to a door being left ajar or during periods where the door is unlocked. Further unlike CSLI, Plaintiffs can decide how much to limit their use of the CrimsonCard for non-essential functions (affording one more opportunity to opt out). And if they wish to limit generating swipe data, they can prioritize privacy over convenience by electing not to use their CrimsonCard for on- or off-campus purchases; opting to use cash or another payment

---

[8] Plaintiffs' exaggerated (and unsubstantiated) claim that "[a] hostile university administration could track which students attended meetings of the Federalist Society or Black Lives Matter; university employees would know who is going to the campus psychologist for counseling or to the campus clinic that test for sexually transmitted disease; they may have records of each evening students spent with their significant other (or were cheating on their significant other), including whether a closeted student is visiting a significant other of the same sex," (Dkt. 28 at 19-20), must be disregarded. This dystopian hypothetical has no basis in fact (nor is it alleged in Plaintiffs' Complaint).

method; opting to bring laundry to a laundromat; bringing their own printer instead of campus print stations; making their own meals or dining off campus; or living in off-campus housing.

Thus, contrary to the CSLI at issue in *Carpenter* or the GPS tracking data at issue in *Jones,* the limited CrimsonCard data allegedly accessed by the University does not provide an "intimate window" into Plaintiffs' lives, detailing their "familial, political, professional, religious, and sexual associations." 138 S.Ct at 2217 (citation and quotation omitted). Nor does it allow Defendants to "explore details of [Plaintiffs' home(s)] that would previously have been unknowable without physical intrusion." *Kyllo*, 533 U.S. at 40. Rather, it simply logs one's authenticated access (or rejected access) to University-owned buildings and campus facilities.

Plaintiffs accepted the CrimsonCard, including the encoded magnetic stripe data capability which necessarily communicates identifying information to authenticate access to University facilities, in exchange for the privilege of attending the University and the conveniences it offers. By accepting these benefits, Plaintiffs cannot now complain about the University's review of the limited swipe data for the legitimate purpose of investigating a complaint of hazing by Beta Theta Pi of which they, and/or fellow pledge class members, were likely victims. (*See* Dkt. 1 at 4, ¶ 19.)

The University's efforts to protect the safety and well-being of its students are legitimate and anticipated uses of the CrimsonCard's data pursuant to IU's Management of Institutional Data Policy (DM-01). Similar to this case, CrimsonCard data is intended to be read by the University and its security systems to ensure only authorized IU cardholders can access University facilities, such as dorm rooms. Considering this function of the CrimsonCard, as well as the CrimsonCard's Terms and Conditions, it is readily apparent that a user must transfer certain swipe card data to the University. *See U.S. v. Bah,* 794 F.3d 617, 631 (6th Cir. 2015) ("A credit card's stored information … is *intended* to be read by third parties. That is the only reason for its existence"); *U.S. v. De*

*L'Isle,* 825 F.3d 426, 432 (8th Cir. 2016) ("[T]he purpose of a credit, debit, or gift card is to enable the holder of the card to make purchases, and to accomplish this, the holder must transfer information from the card to the seller, which negates an expressed privacy interest").

Accordingly, Plaintiffs' alleged privacy interest in their CrimsonCard swipe card data is not one that society recognizes as reasonable. *See, e.g., U.S. v. Turner,* 839 F.3d 429, 436 (5th Cir. 2016) ("society does not recognize as reasonable an expectation of privacy in the information encoded in a [] card's magnetic stripe"). This Court should reject Plaintiffs' claim to the contrary with respect to the CrimsonCard, find there was no "search," and dismiss Plaintiffs' Fourth Amendment claims.

### B.     Plaintiffs cannot rebut the reasonableness of the University's actions.

Even if there was a "search" (there was not), no Fourth Amendment violation occurred here because the University's actions were reasonable. Plaintiffs' argument that the University must "obtain pre-compliance review" before accessing its own records is wrong, as is their analysis regarding the "subject" of the search. (*See* Dkt. 28 at 13-14 (citing *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015).) The ordinance at issue in *Patel* required hotels to record detailed information about their guests and turn that information over to police on demand. *See Patel,* 576 U.S. at 413-14. Indeed, "[a] hotel owner who refuse[d] to give an officer access to his or her registry [could be] arrested on the spot." *Id.* at 421.

There is nothing in *Patel* that suggests the guests were entitled to pre-compliance review, and, contrary to Plaintiffs' argument, the hotel guests *were* the ultimate subjects of the police investigation; the ordinance provided access to the hotels' files on guests to combat crime. That's

the entire point of the law.[9] Because the registration information at issue in *Patel* was the hotels' business records, the hotel would have been free to search its own registry. In much the same way, since IU owns the CrimsonCard records at issue here, IU's search of its own records similarly does not require pre-compliance review. (*See supra* at 10-11) (explaining that cards are intended to be read by third-parties and necessarily communicate data through cardholder's use of same).

Again, contrary to Plaintiffs' argument, the correct inquiry is "reasonableness." *See Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 528 (7th Cir. 2018) (where searches "are not performed as part of a criminal investigation, [the Court] can turn immediately to an assessment of whether they are reasonable") (cleaned up). Plaintiffs' argument that *Medlock* is inapplicable because "this was not a routine health-and-safety inspection" is illogical. (Dkt. 28 at 9.) True, swipe data "cannot show whether you are respecting your roommate by maintaining a clean-living area," but it might help show that a group is not respecting its pledge class by revealing hazing behaviors such as schedule alteration or sleep deprivation. A University's mission to protect its students' well-being applies equally to ensuring their safety from hazards inside of their dorm room, as well as to hazards outside of it.

Last, Plaintiffs' claim that this case is somehow different than *Medlock* because the search was performed by a University official rather than an RA, (*see* Dkt. 28 at 9), is also unpersuasive. In fact, the *Medlock* court expressly said the opposite, finding that "even if the student inspectors had been public officers, their search of Medlock's dorm room would have been a lawful regulatory search." *Medlock,* 738 F.3d at 872. As explained in *Medlock,* for purposes of university

---

[9] *See Patel*, 576 U.S. at 428 (Scalia, J., dissenting) ("The purpose of this recordkeeping requirement is to deter criminal conduct, on the theory that criminal will be unwilling to carry on illicit activities in motel rooms if they must provide identifying information …").

housing inspections, the Fourth Amendment's warrant requirement "can be satisfied by demonstrating the reasonableness of the regulatory package…." *Id.* (internal citations omitted).

Here, the CrimsonCard data was collected without prosecutorial intent toward Plaintiffs, despite their attempt to now assert for the first time (without any basis in reality) that the University somehow intended to "convict [Plaintiffs] of the administrative equivalent of perjury." (Dkt. 28 at 21-22.) Indeed, the University's motivation in accessing the information was to protect students (including Plaintiffs) from possible hazing activity by the fraternity. Second, the data was collected without physical entry into Plaintiffs' home(s). *See Naperville,* 900 F.3d at 528 (citing a concern that physical entry posed a "serious threat to personal and family security"). In sum, even assuming Plaintiffs have a limited Fourth Amendment privacy interest, it is far outweighed by Defendants' interest in investigating allegations of, and working to protect its students from, hazing, which is prohibited by both IU's Code of Student Rights, Responsibilities, and Conduct[10] and by Indiana law, *see* Ind. Code § 35-42-2-2.5. Viewed through the lens of protecting the health and safety of its students, the University's actions, as was the case in *Medlock*, were unquestionably *reasonable*.

Because Plaintiffs' Fourth Amendment claims are either barred by the Eleventh Amendment or fail as a matter of law, Counts I and II of Plaintiffs' Complaint should be dismissed.

## III.   Plaintiffs cannot avoid dismissal of Count III by supplementing their Complaint with "facts" which are inconsistent with their pleading.

The majority of Plaintiffs' response to Defendants' request to dismiss Plaintiffs' breach of contract claim (Count III) focuses on listing hypothetical situations or potential damages which are inconsistent with the facts *as pled* in their Complaint. (*Compare* Dkt. 1 *with* Dkt. 28 at 21-24.) Perhaps recognizing they have not suffered any *actual* damages—or that the contracts at issue do

---

[10] *See* Dkt. 20 at 20 n.12.

not actually prohibit the actions Defendants allegedly performed—they now take on the mantle of attempting to vindicate their fraternity, which was sanctioned for hazing violations that occurred while Plaintiffs were pledging. Of course, the fraternity is not a party to this lawsuit, and Plaintiffs cannot revive their own claims by adopting supposed harm to their fraternity.

> **A.    Plaintiffs' argument that they have standing to assert a breach of contract claim is foreclosed by the facts *as pled* in their Complaint.**

 Where, as here, Defendants have questioned Plaintiffs' Article III standing to bring a breach of contract claim, Plaintiffs "must supply proof, by a preponderance of the evidence or to a reasonable probability, that standing exists." *Spuhler v. State Collection Serv. Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) (citations omitted). Plaintiffs have not come forward with any evidence, let alone proof to a reasonable probability, to support the factual allegations they pled in their Complaint. Rather, Plaintiffs rely on "facts" which are neither true nor contained in their Complaint. Specifically, Plaintiffs claim to have standing for their breach of contract claims because (1) "privacy violations are an inherent injury," (2) "continued retention of swipe data without appropriate safeguards represents an *ongoing injury*," (3) Plaintiffs were "subjected to an illegal process, [as] part of an official investigation which is represented in their academic records," (4) though not personally disciplined, their fraternity was sanctioned and, as members, they were harmed by extension, and (5) the breach violated their Fourth Amendment rights. Addressed in turn, none of Plaintiffs' arguments hold water.

*First,* Plaintiffs' broad assertion that "privacy violations are an inherent injury," and their reliance on the Northern District of California's decision in *In re Facebook, Inc. Consumer Privacy User Profile Litigation,* 402 F. Supp. 3d 767 (N.D. Cal. 2019), is misplaced. That court did *not* broadly hold that any claimed privacy violation satisfies Article III's standing requirement. Rather, the court considered whether Facebook's disclosure of users' sensitive personal information to

- 14 -

third parties—including a British political consulting firm—could confer Article III standing. In deciding it did, the court found the alleged injury that these users' sensitive information "was disseminated [by Facebook] to third parties in violation of [users'] privacy – [was] sufficient to confer standing." *Id.* at 784. Here, in stark contrast, Plaintiffs pled that IU accessed limited data from Plaintiffs' CrimsonCards (which are University property) to "compar[e] their 'swipe' data to their testimony as to their whereabouts at the time of the [hazing] incident." (Dkt. 1 at 4, ¶ 18.) Indeed, in another decision involving Facebook, discussed in Section II(A) above, the court dismissed plaintiffs' complaint in its entirety for lack of Article III standing. *Heeger,* 2020 WL 7664459, at *3-4. Like in *Heeger*, where the only factual allegations were that Facebook collected, stored, and used plaintiffs' IP address information to determine log-on location, here, the only allegations are that the University collected, stored, and used Plaintiffs' CrimsonCard swipe data to confirm when they accessed their residence hall. These allegations are insufficient to confer standing.

For similar reasons, Plaintiffs' *second* argument also fails. Plaintiffs' Complaint does not allege that the University retains their CrimsonCard information indefinitely, or that the University failed to adopt proper safeguards to protect Plaintiffs' 'swipe' data. To be clear, there is no allegation that the University's system was breached or this information was disclosed to third-persons outside the University. (*See generally* Dkt. 1.) Indeed, in their Complaint, Plaintiffs allege that IU only "retain[s] the swipe data for several months" and, in this instance, used it to compare student testimony to their 'swipe' data to corroborate their location in connection with a hazing investigation into the fraternity they were pledging. (*Id.* at 4, ¶ 18.)

*Third,* Plaintiffs claim that they were subjected to an "illegal process," and further (and inaccurately) assert the outcome is somehow recorded in their academic record, (Dkt. 28 at 21-

22). These claims are *not* contained in their Complaint. By Plaintiffs' own admission, Beta Theta Pi—and not Plaintiffs themselves—was the subject of "an investigation by IU officials into suspected or alleged hazing incidents." (Dkt. 1 at 3, ¶ 14.) Nor were Plaintiffs disciplined for any conduct related to the University's investigation of same. (*Id.* at 4, ¶ 19.) Because Plaintiffs are limited to the allegations in their Complaint, this argument fails.

*Fourth* and relatedly, while Plaintiffs concede that they were not *personally* disciplined, they claim that "the fraternity, which they are still members of, *was* subject to sanction," which somehow represents an injury to them. (Dkt. 28 at 22.) Yet, Plaintiffs have not provided any cogent argument in support of this novel spin on third-party standing, let alone how the disciplinary action taken against Beta Theta Pi is a sufficient "injury" to confer standing on *them*. Indeed, Beta Theta Pi was never suspended nor expelled from IU's campus—rather, it was placed on Disciplinary Probation, which "includes a warning that any violation of the conditions, or any further acts of misconduct, will result in additional sanctions …."[11]

Even if action against Beta Theta Pi amounted to an action against the Plaintiffs individually (it doesn't), the University's actions do not amount to an "injury," for purposes of Article III standing. In a case where a fraternity was sanctioned and the university withdrew official recognition of the chapter, the court found that "[n]othing in the University's sanctions prevents the Chapter from continuing to exist … [a]lthough the Chapter may become a less attractive organization as a result of losing official recognition, the University's action does not deprive

---

[11] Beta Theta Pi was placed on Disciplinary Probation from October 27, 2017 through January 27, 2018, due to an unrelated incident and, then again, from February 28, 2018 through December 31, 2018, as a result of the hazing incident described in Plaintiffs' Complaint. *See* ORGANIZATION SUBJECT TO DISCIPLINE IN 2020-2021, DIVISION OF STUDENT AFFAIRS, available at https://studentaffairs.indiana.edu/get-involved/student-organizations/manage-organization/policies/disciplinary-status.html (last visited March 17, 2021) (identifying organizations on disciplinary status within the past five years). For purposes of this Motion, the Court may take judicial notice of matters of public record, including government websites. (*See* Dkt. 20 at 4 n.4) (citing cases).

Chapter members of their constitutional right to associate with each other." *Iota XI Chapter of the Sigma Chi Fraternity v. Patterson,* 538 F. Supp. 2d 915, 924-25 (E.D. Va. 2008), *aff'd by* 566 F.3d 138 (4th Cir. 2009). So too here. Where a party alleges stigma-based injury to establish standing, it must "seriously damage plaintiffs standing and associations in the community," *Lebron v. Rumsfeld,* 764 F.Supp.2d 787, 806 (citing *U.S. v. 5 S 351 Tuthill Rd, Naperville, Ill.,* 233 F.3d 1017, 1022 (7th Cir. 2000)), of which, here, there is no evidence, let alone any allegation.

*Fifth,* Plaintiffs conflate Article III standing for their breach-of-contract claim with Fourth Amendment standing for their Section 1983 claims. "[U]nlike Article III standing, standing under the Fourth Amendment is not jurisdictional; instead [it is] analyze[d] as a merits issue." *Presley v. U.S.,* 895 F.3d 1284, 1290 (11th Cir. 2018); *Byrd v. U.S.,* 137 S.Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief … but it should not be confused with Article III standing …"). Because Plaintiffs are *current* undergraduate students, and they *were not penalized or otherwise found guilty of any wrongdoing* after their data was accessed, (Dkt. 1 at 4, ¶ 19), then by their own admission, they have not suffered an Article III "injury." Nor do Plaintiffs address how their nonexistent injury would be remedied by this Court, which is a requisite for establishing standing. (*See* Dkt. 20 at 23) (explaining why Plaintiffs' claim for nominal damages fails to meet Article III requirements).

Thus, if it is not dismissed on sovereign immunity grounds, Count III must be dismissed pursuant to Rule 12(b)(1) for lack of standing. *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017).

**B.      Alternatively, Count III of Plaintiffs' Complaint fails to state a claim.**

Even if this Court were to determine that Plaintiffs have standing to bring their breach of contract claim, and it is not dismissed on sovereign immunity grounds, the Court should dismiss Count III for failure to state a claim pursuant to Rule 12(b)(6).

**1.      Plaintiffs' argument is contrary to the express terms of the alleged contracts.**

Plaintiffs' claim for breach of contract—and their argument in response—is contradicted by the unambiguous language of the contract at issue; therefore, the Court should dismiss Count III pursuant to Rule 12(b)(6). *See, e.g.*, *Bartel v. NBC Universal, Inc.*, 543 F.3d 901 (7th Cir. 2008); *McWane v. Crow Chicago Indus., Inc.,* 224 F.3d 582, 584 (7th Cir. 2000) ("The unambiguous contract controls over contrary allegations in the plaintiff's complaint." (internal citations and quotations omitted)).

Indeed, Plaintiffs argue that "[n]othing in the CrimsonCard Terms and Conditions or the University's Policy Manual permits using the data to track[12] students." (Dkt. 28 at 3.) But, then, by extension of the same logic, nothing in those policies actually *prohibits* it. (*See* Dkt. 20 at 23.) It is black letter law that a there can be no breach of contract if the contract at issue does not actually create the duty the plaintiff alleges was breached. (*Id.*) Rather, the contract at issue must *actually prohibit* the alleged conduct—something Plaintiffs never address or respond to in their Opposition. (*See generally* Dkt. 28 at 22-24.) That's because there is nothing to rebut; the policies at issue do *not* expressly prohibit the conduct Plaintiffs complain about and, in fact, the policies—when viewed in totality—support and define the University's ability to use the CrimsonCard data to protect the health and safety of the campus community and to advance the University's mission.

---

[12] As set forth above, in connection with their Fourth Amendment argument, Defendants deny that the University is "track[ing] students."

For this reason alone, the Court should dismiss Plaintiffs' breach-of-contract claim for failure to state a claim. *See Perfect Flowers Inc. v. Teleflora LLC*, 2012 WL 2994636, at *3 (S. D. Ind. July 20, 2012) (dismissing breach of contract claim where no provision in the contract prohibited defendant's alleged conduct); *Acheron Med. Supply, LLC v. Cook Int'l*, 2017 WL 4310163, at *7 (S.D. Ind. Sept. 28, 2017) ("Indiana law very much eschews the practice of courts interfering duties that the parties have not included in their unambiguous contracts").

Additionally, IU owns all CrimsonCards and the data they generate. (*See* Dkt. 20-1 at 1; Dkt. 20-2 at 3.) Thus, Defendants cannot breach their contract with Plaintiffs by accessing data the University already owns. *Compare In re Facebook, Inc. Consumer Privacy User Profile Litigation,* 402 F. Supp. 3d at 767 (permitting claim alleging that Facebook disclosed of users' sensitive personal information to third parties to proceed), *with Heeger,* 2020 WL 7664459, at *3-4 (dismissing claims alleging that Facebook collected, stored, and used plaintiffs' IP address information but did not disclose it to outside parties). Because Defendants did not breach their contractual agreement(s) with Plaintiffs by accessing CrimsonCard data, as alleged in the Complaint, Count III of Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(6).

## 2. Plaintiffs' unaverred and speculative "damages" are not recoverable.

In their Opposition, Plaintiffs state that "there are many ways in which the breach in this case damaged plaintiffs …." (Dkt. 28 at 24.) But none of these so-called "damages" are outlined in their Complaint, nor are they legitimate contract damages. To be clear, Plaintiffs all but admit they have suffered no actual damages, hiding instead behind their claim that their damages are just "difficult to calculate," and claiming a privacy breach is in and of itself a sufficient damage. (*See id.* at 25.) Plaintiffs then claim that a party's mere pleading of "nominal damages" is sufficient to survive a 12(b)(6) motion, citing a 1986 Supreme Court footnote. (*See id.*) Not only does that

case—*Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299 (1986)—predate *Twombly-Iqbal's* 'plausibility' requirement,[13] but it is not even a contract case; it's a civil rights case analyzing Section 1983 damages where deprivations of due process have not caused actual, provable injury. *Id.* To say the "absolute rights" at issue in *Stachura* are distinguishable from the contractual rights raised in Plaintiff's Count III is an understatement. Indeed, even Plaintiffs' Complaint ties their requested nominal damages to their Section 1983 claims. (Dkt. 1, ¶¶ 48, 55).

Damages are a necessary element of a breach of contract claim, and it is the plaintiff's responsibility to plead and prove them. *See Shepard v. State Auto. Mut. Ins. Co.,* 463 F.3d 742, 745 (7th Cir. 2006) ("A mere showing of a breach of contract does not necessarily entitle a plaintiff to damage.") (internal citation omitted). Defendants did not breach any contract with Plaintiffs. But even if they did, such breach would be insufficient to state a claim without Plaintiffs having pled a resulting injury. Thus, Count III must be dismissed for failure to state a claim. *See Small Bus. Lending, LLC v. Pack*, 2020 WL 1702230, at *7-8 (S.D. Ind. Apr. 8, 2020).

<u>CONCLUSION</u>

Plaintiffs' reliance on "facts" outside the Complaint cannot save their lawsuit from dismissal. Except for their claims for prospective injunctive relief against President McRobbie in his official capacity, all of Plaintiffs claims should be dismissed on sovereign immunity grounds. The remaining official-capacity claims against President McRobbie fail as a matter of law, as Defendants' actions did not violate Plaintiffs' Fourth and Fourteenth Amendment rights. Defendants respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice, pursuant to either Fed. R. Civ. P. 12(b)(1) or 12(b)(6).

---

[13] *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Respectfully submitted,

ICE MILLER LLP


 /s/ Sean T. Dewey_____
Jenny R. Buchheit
Stephen E. Reynolds
Sean T. Dewey
Tiffany S. Kim
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
jenny.buchheit@icemiller.com
stephen.reynolds@icemiller.com
sean.dewey@icemiller.com
tiffany.kim@icemiller.com

*Attorneys for Defendants Indiana University,
Bloomington and Michael McRobbie, in his official
capacity as President of Indiana University*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2021, a copy of the foregoing was filed electronically through the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

Anita Y. Milanovich
MILANOVICH LAW, PLLC
100 East Broadway Street
The Berkeley Room
Butte, MT 59701
aymilanovich@milanovichlaw.com

Jeffrey M. Schwab
Daniel R Suhr
Reilly Stephens
LIBERTY JUSTICE CENTER
190 South LaSalle Street, Suite 1500
Chicago, IL 60603
jschwab@libertyjusticecenter.org
dsuhr@libertyjusticecenter.org
rstephens@libertyjusticecenter.org

*Attorneys for Plaintiffs*

 /s/ Sean T. Dewey
Sean T. Dewey

ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
(317) 236-2100

- 22 -